Good morning. Mark Fleming of Wilmer Cutler Pickering Hale & Dorr, Pro Bono Counsel on behalf of the petitioner, Joel Judulang. With the Court's permission, I'd like to reserve two minutes for rebuttal if possible. This is a petition for review of an order of removal by the Board of Immigration Appeals. It involves two principal issues. The first is Mr. Judulang's opportunity to seek derivative U.S. citizenship, and the second is his eligibility for a waiver of deportation under Section 212C of the INA. The BIA did not give Mr. Judulang an opportunity to develop either of these claims, and its reasons for doing so were erroneous. The 212C claim should be remanded back to the Board, and the citizenship claim should be transferred to the district court for further proceedings. I'll address the derivative citizenship issue first, because if Mr. Judulang is entitled to citizenship, then the deportation issue will fall away. There are certain criteria that have to be satisfied for Mr. Judulang to claim U.S. citizenship. The Board's decision addressed only one of them, and it did so incorrectly, and that was the requirement that to receive citizenship from his father, his father had to have 10 years of qualifying physical presence. And I don't think there's any dispute on the government's side that the BIA's analysis of this issue was incorrect. The remaining question is whether any of the other criteria for derivative citizenship are met, either for citizenship deriving from his father only or from both his parents. Well, let me take one thing off the table, maybe. Are you disputing that his mother naturalized in 1985 after his 18th birthday? That appears to be the case based on the documents that I have, Your Honor. Okay. And the question is — You're not — that's not an issue in dispute, then? The fact that she naturalized after he turned 18 and he was 18 years and I believe 11 months old, that's not in dispute based on the record that I have. However, it appears that his mother became eligible to naturalize significantly before his 18th birthday, and she's informing that she recalls that she petitioned long before his 18th birthday. And that's the reason that the documents that the government has yet to produce under FOIA are relevant to determine whether there might be a claim based on — Well, but if she just thought about it or she was trying to do it, what case law would you have that that would help you? Well, not if that were the case, Your Honor, but if there were some reason for delay that were not chargeable against her, then there would be a due process claim. For instance, if the petition was submitted well in advance and it was lost by the government, or if there was some other reason that it was not processed for an unduly long amount of time, then there would be a — But is there anything in the record to suggest that's the case? Well, I haven't had an opportunity to review the full record because I'm still waiting for it from the government. That is something that I would be happy to supply to the Court. The moment I receive the documents, the request has been outstanding for several months. I don't see why they won't be produced any time soon. And the district court is in a perfectly good position to handle further proceedings once the documents come in. If there is no basis for a claim, the matter will be at an end. If there is a basis for a claim, I think it would be significantly prejudicial to Mr. Judelang to deport him based on the BIA's erroneous analysis of the citizenship claim when the — when the documents haven't yet been produced. There's no showing of prejudice and no claim of prejudice on the government's side. They have the documents. It's simply a matter of reviewing them. Well, counsel, that's an argument that I hear a fair amount of as a district court judge. But when you're in the court of appeals making it, it seems to me you need a stronger case. Well, this Court has held, and I think the other circuits that have addressed it, have held that this Court's role at this point is similar to a judge addressing a summary judgment motion. But one of the common requirements under summary judgment is the 56F requirement, which is when the nonmoving party has not had an opportunity to review the full summary judgment determination is deferred until those materials can be reviewed. And I would submit that that is the appropriate course here. Whether it's remanded to the district court or another option that would — this Court would have would be to hold this issue in abeyance here, and I'd undertake to make a prompt submission the moment I've had a chance to review the documents. I would turn to the 212C issue, if I may, unless the Court has further questions on this case. Does Mr. Judelang — does he contend that voluntary manslaughter is not categorically a crime of violence to aggravated felony? Voluntary manslaughter is certainly a crime of violence. That was not in dispute below. And it is an aggravated felony, and it is a ground for — it is a basis for deportability under the deportation statute. The question is whether it is a ground that may be waivable under Section 212C. And I think there are clear holdings both by the BIA and the equal protection holdings of this Court that make clear that when an alien leaves the country, and comes back with a voluntary manslaughter conviction, that conviction is treated as a crime involving moral turpitude, which it clearly is, and is waivable. And so the question is whether equal protection requires that same outcome in a situation like this one, where Mr. Judelang is in deportation proceedings and has not left the country since his conviction. And this Court's decision in Tapia Acuna makes clear that equal protection requires the extension of 212C to Petitioners like Mr. Judelang who are convicted of an offense that would render them excludable had they left the country. The statutory counterpart doctrine, which is the main thrust of the government's defense in this case, is simply an implementation of that equal protection analysis. If the doctrine is properly applied, it simply inquires whether the offense of conviction is one that would render the alien excludable were he to leave the country. And that's borne out, I think, by the development historically of the counterpart doctrine. 212C on its face, as the Court is well aware, applies only in exclusion proceedings to aliens who are coming to the border either for the first time or who have left the country and then returned after a brief stay abroad. But since the 1960s, the Board has made it available in deportation proceedings as well for aliens who are in the country but who left the country briefly and came back and then are put in deportation proceedings, the theory being that it is not fair to treat an alien worse than he would have been treated had he come back and been put in exclusion proceedings. And when the Board summarized that rule in a matter of Silva, it used language that I think is quite applicable to this particular case. It said that a 212C waiver is available in deportation proceedings if, quote, at the time of the alien's last entry, he was admissible because of the same facts which form the basis of his deportability. Now, when the courts later in decisions like Francis and Tapia Acuna extended 212C to deportable aliens who had not left the country, this limitation carried forward, but it was satisfied whenever the conduct that made the alien deportable would also make the alien excludable following a departure from the country. And that's the rule that was applied in Kapusuk, this Court's decision, which is one of the seminal decisions on the counterpart doctrine. That was a firearms case, and the analysis there depended on whether the reason that the alien was deportable, which the Court called the ground of deportability, would also be a reason for exclusion. And it's clear from the usage in the opinion that when the Court is talking about a ground, it means the offense of conviction. I refer the Court to page 1325 of that decision, where the Court is summarizing the issues in a prior case called Gutierrez. And in Gutierrez, the Kapusuk Court noted one of the, quote, grounds for deportation was conspiracy to distribute cocaine, which the Court notes was also a, quote, ground for exclusion. Now, conspiracy to distribute cocaine is not a statutory subsection. It's not language that appears in the deportation statute. It's not language that appears in the exclusion statute. Rather, it is a crime. It's the offense of conviction that made Mr. Gutierrez both deportable and excludable. Judge Wallace's concurrence in Kapusuk is explicit on this point. The focus is on the crime that the alien has committed and whether it is a crime that is, quote, distinct and different from any of those crimes and actions that are grounds for exclusion. I note that the very recent Seventh Circuit case that the government placed before the Court last Friday, the case of Valere, articulates the rule in exactly that way,  The Seventh Circuit says that if the removable alien's, quote, crime of conviction is not substantially equivalent to a ground of inadmissibility, then a waiver is unavailable. And the Second Circuit just came out with a decision this past Friday, and I'm very grateful to the counsel of the government for providing it to me this morning. I understand she's also lodged it with the Court, and that is the decision in Blake v. Carbone, which is the very case in which the BIA first articulated this new theory and new approach to the counterpart doctrine. The Second Circuit reversed the BIA on Friday, in the Blake case, and made very clear that the counterpart analysis focuses on the specific crime committed by the alien. And that's evident from the passage near the end of the opinion. This is page 27 of the slip opinion, which, if the Court doesn't have it, we can provide it in short order. The Second Circuit says, echoing the equal protection analysis in Tapia, Acuna, and in Francis, that what makes one alien similarly situated to another is his or her act or offense, which is captured in the INA as either a ground of deportation or a ground of exclusion, citing Cato v. INS and Bedoya Valencia v. INS. Therefore, each petitioner, a deportable lawful permanent resident with an aggravated felony conviction, is eligible for a 212c waiver if his or her particular aggravated felony offense could form the basis of exclusion under Section 212a as a crime involving moral turpitude. And that is perfectly consistent with the equal protection analysis that this Court adopted in Tapia, Acuna, and that was applied in Cabasug and was also applied in Comarenco. Now, the Second Circuit appeared to think that it was reaching a result that was somewhat different from Comarenco, and I need to study the opinion more carefully to understand the basis of that. But based on my understanding of Comarenco, the equal protection analysis there was no different from what was done in Cabasug. Indeed, the Comarenco court reaffirmed and approved the Cabasug approach. It's just that in Comarenco, there was a slight wrinkle, which is that it was not clear what the consequences of the particular firearms conviction there would have been had the alien left the country. The alien tried to argue that it would be treated as a crime involving moral turpitude, and this Court held that it would not speculate as to what would happen if the alien left the country. Here, there's no speculation required. It is clear, and there's a precedent going back to this Court's decision in Brimer in the 1930s that voluntary manslaughter is a crime involving moral turpitude and it is an excludable offense. Yes, Judge Callahan. And with all of your arguments, do you agree, though, that the submission of this we're going to have to defer submission of this case pending the decisions in, we've got several, Abebe v. Gonzales, Ledesma-Sandoval v. Gonzales, Sosa-Gonzales, and Modriff v. Gonzales, which were submitted December 4th? I'm not sure what the Court's internal procedures are with respect to prior submitted cases. I mean, certainly they do seem to respond. They are there before we are. They certainly raise the similar issue. Right. I would say there's... So they have the first stab at it, so we have to wait and see what they do. That may be right, Your Honor, and when the Abebe decision comes out, I will certainly provide the Court with a copy of it and a 28-J submission. Oh, we'll see it, yeah. I beg your pardon? We'll see it. Oh, certainly you will. Probably that, I mean, if, I mean, we are going to have to wait for those, but, and if we feel that we need additional things from counsel at that time, we ask for that. Otherwise, if we feel that we don't need counsel's assistance in resolving it, then we, you know, we do it at that point. There is one point I would raise, Your Honor. I'm not fully up to speed on all the facts of all the different cases that were argued back in December. There may be some ambiguity, as there was in Komarenko and as there was in Brieva, for instance. In Brieva, the Board of Immigration Appeals actually said that the crime at issue, unauthorized use of a vehicle under Texas law, was not generally considered a crime involving moral turpitude.  There may be some ambiguity. In Brieva, there was a stronger case for the government that it would be an act of speculation for the court to determine whether the alien would be excludable upon return. That is not true of this case. Here there is absolutely no dispute that this is a crime involving moral turpitude. Indeed, the government charged it as one throughout this case, and the I.J. determined that it was one. So that is one issue that whatever happens in the December cases is particular to this case. I would like to address the argument that the government makes about terminology, because that is an interpretation of the counterpart doctrine that I think is incorrect and it's inconsistent with the Board's own practice. As I understand it, the government's argument is that the counterpart doctrine is never satisfied unless the provisions of the deportation statute and the exclusion statute have substantially identical words in them. Now, it's certainly true that the counterpart analysis starts with an analysis of the terminology of the statutes, and sometimes that's enough to resolve the issue in the alien's favor. And that's true of cases involving drugs, where the statutes are very similar. But there is a second step, and the second step looks at the offense of conviction as the Second Circuit recognized and as the Board recognized as early as Matter of Granados, which is a case in the 70s. Granados was another firearms case that involved possession of a sawed-off shotgun and in determining whether Mr. Granados could apply for 212C, the Court not only looked at whether there was a specific statutory ground of exclusion involving possession of a sawed-off shotgun, but it then went on to determine that the conviction was not a crime involving moral turpitude. And if terminology were the only thing at issue, there would have been no need to carry on to that further determination. And I think most importantly, that is the analysis that the Board has used in numerous crime of violence cases, including manslaughter cases. A prime example is Matter of Reyes, which is attached as tab 1 to the blue brief. That's a manslaughter case from 2003 where the government made exactly the argument that it is making here today, that there is no counterpart ground to a manslaughter conviction. The BIA expressly rejected that and found that a manslaughter conviction satisfies the counterpart ground requirement because it is a crime involving moral turpitude. There are numerous other decisions that are cited in the brief. Matter of Hussain from 2004, Matter of Loney, same year. Matter of Munoz, 2003. These cases show that it was a routine practice before 2005 for the Board to allow crime of violence case, allow applications for 212C in crime of violence cases, and even for them to be granted in some situations. And I would note that the government has not identified a single case before 2005 going the other way, not one. So that gets rid, I think, of any argument for Chevron deference here. I think clearly what happened was that the Board took a complete change of course in how it interpreted the statutory counterpart doctrine. It did not even address its prior decisions on this point. It didn't purport to give any reason for deviating from them. And as this Court has held in Law v. INS and Israel v. INS, there is no deference to a Board decision that departs without explanation from prior precedents and policies. Unless the Court has any questions, I have four and a half minutes left. I would reserve it for rebuttal if I may. All right. Thank you. I'll let you do that. Thank you. Good morning, Your Honors. Patricia Corrales representing the Attorney General respondent in this case. Good morning. If I may, let me begin with the citizenship issue. I believe in this case the Petitioner, Mr. Joulon, has waived the derivative citizenship claim. I think what happens when it comes to citizenship that everything is just combined under this word called derivative. Actually, there's two things. It's derivative citizenship under 1437, 8 U.S.C. 1437, the counterpart being 321 of the INA. And there's citizenship by acquisition. That means citizenship at the time you are born. And that's under 301. Now, the Petitioner in this case never claimed that the immigration judge or the board was incorrect in their analysis about the derivative citizenship. And the derivative citizenship claim is the claim where the Petitioner has to show that both his parents naturalized. There's three triggering events. The Petitioner has to show that he was a lawful permanent resident, that he resided in the United States, and that his parents, both of them, were naturalized prior to his 18th birthday. The Petitioner has not been able to show that his mother naturalized prior to his 18th birthday. As the Court correctly pointed out, the Petitioner was 19 at the time that his mother naturalized. It does not matter that the mother may have petitioned for naturalization prior to, nor does it matter that she may have been eligible prior to the Mr. Joulon's 18th birthday. The fact of the matter is she did not naturalize until he was 19 years old. So that is not an issue before this. First of all, he has not derived U.S. citizenship benefits, and that is not an issue that he's actually appealed or that he's claimed was a badly done decision of the immigration judge or the Board of Immigration Appeals. What he is arguing is that he has acquired U.S. citizenship. Now, acquisition is a little different. In that case, the Petitioner has to show that his father was a U.S. citizen and that his father lived in the United States 10 years prior to his birth, five of which was after the father turned 14. There is absolutely no evidence on the record that Petitioner can establish that his father was a U.S. citizen. In fact, wasn't the evidence in the record that his father was in the Philippines? Yes, Your Honor. Okay. Now, and I think I will go back and ask appellant's counsel on this, but I'm not sure how I think that the argument made is that it was an outlying possession of the United States, but the Immigration and Naturalization Act of 1952 defines that as American Samoa and Swains Island? Yes, Your Honor. And this Court has already reached that decision in Rabanc, which is a decision reached by this Court in 1994. That's the seminal case in the Ninth Circuit where the Court has specifically found that the Philippines is not within the possession of the United States, and a person born in the Philippines would not have acquired U.S. citizenship by time of birth. But I think more importantly, as the Court pointed out, the record that the Petitioner has provided is everything shows that the parents were born in the Philippines, that the father was not a U.S. citizen but a Philippine national and a citizen of the Philippines. In fact, if the father were a U.S. citizen, there would be no need for the father in 1958 to file a declaration that he would hope to be a U.S. citizen in the future, that reserve his right. There would be no need of that. There would also be no need for the father to have filed a naturalization application to be naturalized. So I don't think in this case there's any genuine issue whatsoever that would require this matter on the citizenship claim to be transferred to the district court. There – the Court is not – we're not here for a fishing expedition. So he hasn't reviewed the files. So he hasn't determined what, you know, whether the mother was eligible or wasn't eligible. That's not an issue. The standard is there has to be a genuine issue. It's similar to a summary judgment standard, Your Honors. And there's no genuine issue in here that the father – that the Petitioner, Mr. Julian, has any claim either by derivation or acquisition of citizenship and the matter should not be transferred to the district court. Well, let me ask you this. In terms of I – you know, I mentioned that we've got some cases pending in this circuit that we're going to have to wait for before resolution. But how should we treat the IJ's additional ruling that Judah Lang was also removable for suffering a conviction involving moral turpitude? Well, Your Honor, it's an interesting question that you pose. I agree that in the issue – in regards to – Does it have an answer? Let me think of one, Your Honor. Actually, they never argue that. And so I do think that's a – they've waived that argument. That was not an argument that they made before the board nor an argument that they made before this court. So I would argue that it's waived. But if I can just address it, I do agree with the court's analysis that there have been other matters submitted on the 212C analysis and the counterpart statutory scheme. And I do think those courts do – those other courts do have a lead on those cases. As to the CIMT issue specifically, I think the court's leading case, Comorenco, even though its framework was a little different, I think it is a seminal case of the circuit and the court should follow it. Even in that case, the court has made it specifically clear that not all Let me back up. What the court said in Comorenco I think makes sense in this, in that the court made the analysis that not all crimes involving moral turpitude are necessarily aggravated felons and vice versa. So I do think, unlike what Mr. Judelang's counsel said, I don't think that the crime of involuntary manslaughter, for which Mr. Judelang was convicted in this case, is necessarily a statutory counterpart to the 212A crime involving moral turpitude. There is a distinct difference in this case. And I think if the court were to follow what Petitioner is asking the court to do in this case, it would frustrate Congress's intent. Congress made it specifically clear that as to crimes of violence, 212C is not viable to those individuals who have committed those crimes. So to allow Mr. Judelang to say, well, I've committed this crime, and it also can fall under the category of a crime involving moral turpitude, will definitely frustrate the congressional intent in this case. Because, as I said before, and the intent of Congress is made clear by Ira Ira and Adipa, Congress specifically made crimes of violence not waivable. And on that note, if the Court has any additional questions relating to the citizenship claim, I'd be happy to address that. It does not appear that we do. Thank you, Your Honors. And we submit on the record. All right.  Just a few points briefly, Your Honor. On the citizenship issue, the Philippines were an outlying possession of the United States until their independence in 1946. That is clear from the Court's decision in Ablang. What do we do with this 1952 Act? The 1952 Act stated that as of that time, American Samoa and the Swains Islands were the only ones left because the Philippines had become an independent country. But this Court said in the Ablang case in Footnote 1, the Philippines were an outlying possession of the United States until July 4, 1946. And that's the cutoff date for the qualifying physical presence for Mr. Judelang's father's residence in the Philippines. Under that basis, there was also further qualifying residential period because he was a minor child in the household of a U.S. Army serviceman serving honorably in the military. And that's all laid out in the brief. And as I understand it from the government's brief, there was no dispute that Mr.   And that's the cutoff date for the qualifying physical presence requirement. And as to the genuine issue test, again, I would rest on what I said before, which is that the genuine issue test only kicks in. But they aren't conceding that it was an outlying possession, are they? I believe they are, Your Honor. Certainly in the brief, they seem to say that at least until 1946, I can find the cite, if that would be helpful. Regarding the crime-involving moral turpitude issue that, Judge Callahan, that you raised, the reason it wasn't briefed in this Court is because the Board of Immigration Appeals did not rely on it. The Board in this case only relied on the manslaughter conviction as an aggravated felony, and it declined to reach any further issues. And under Ventura and under this Court's decision in Andea, it's clear that if the Board's decision was wrong on its own reasoning, there has to be a remand. There's no alternate ground of affirmance in this type of situation, and I don't think that the government disputes that basic principle of law. So if there is some question as to removability on the basis of crimes involving moral turpitude, that is something for the Board or the immigration judge to address in the first instance on remand. The point about congressional intent, quite honestly, I find somewhat confusing. And the Second Circuit itself, in the decision that was issued on Friday in the Blake case, exposed this claim for what it is. There is no congressional intent that is relevant to this particular area, because as the Court well knows, the applicability of 212C in deportation proceedings was a constitutional extension based on equal protection principles. Congress never turned its mind to this. And so the question is, what does equal protection require, and what do the statutory counterpart doctrine, which implements the equal protection analysis, require? The notion put forth by my — by counsel for the government that Congress said 212C was not applicable to crimes of violence is not anywhere in IRAIRA. It's not anywhere in AEDPA. On the contrary, looking at the St. Cyr decision in the Supreme Court suggests that because the repeal was not retroactive, 212C remained available to a broad category of aliens, including aliens convicted of crimes of violence, assuming that the convictions would render them excludable if they departed the country. I think that's also shown by the government's various briefs in this Court in cases like Cordes v. Gonzales and Ubaldo-Figueroa. I think the brief in Ubaldo-Figueroa is very telling, and this is cited in the reply brief, and the relevant portions are attached, when the government said that had Congress wished to repeal 212C for all crime of violence cases, it could have done so. That certainly shows that at least as of the time of that case, the government itself believed that 212C was available to at least some crime of violence petitioners and that the theory that the BIA put forward in this case below and in Blake and in Brieva was a completely new construct. It had no basis in equal protection, no basis in the Board's prior decisions. It was a radical C change, and it should be disapproved. I think unless the Court has any more questions, I would conclude at that point forbidding Mr. Judlein from even applying for 212C. It was irrational. It violated prior decisions. It violated equal protection. Judge Callahan, you observed before that there's no justice on the Ninth Circuit. There certainly is justice in the Ninth Circuit, and the just and constitutional result here is for a grant of the petition and a remand to the Board. Thank you. Thank you both for your excellent argument in this matter. I do want to we're going to defer submission on this case, and as indicated, we're going to defer submission in this case pending the decisions in the Beebe v. Gonzales 0576201, Ledesma-Sandoval v. Gonzales 0577082, Sosa v. Gonzales 0577250, and Madra v. Gonzales 0577191. And you, Mr. Fleming, I believe you indicated you were pro bono counsel. Is that correct? Yes. You know, I do want to publicly acknowledge that the Court very much appreciates those lawyers that are willing to give us pro bono service. You both did an excellent job on argument today, and we're very appreciative of lawyers stepping up to the plate and taking over these difficult cases. Both of your argument was very helpful to the Court today. Privileged to appear before you. Thank you, Your Honor. Thank you. The last matter on calendar is Paul Lozano v. AT&T Wireless Services 0556466, 0556511.
judges: Hall, Callahan, Robart